

ORIGINAL



FILED
CLERK, U S DISTRICT COURT
APR - 6 2004
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY



Priority ✓
Send ✓
Enter —
Closed —
JS-5/JS-6 —
JS-2/JS-3 —
Scan Only —



ENTERED
CLERK, U.S. DISTRICT COURT
APR   8 2004
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNTIC MALICK MUNFORD,<br><br>Plaintiff,<br><br>v.<br><br>VIRGIN ENTERTAINMENT HOLDINGS, INC., *et al.*,<br><br>Defendants. | NO. CV 03-1819 SJO (PLAx)<br><br>**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |

The Court is in receipt of Defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. After careful review of the record, this Court hereby GRANTS Defendants their summary judgment motion because Plaintiff failed to provide genuine issues of fact.

## FACTUAL BACKGROUND

This action stems from a controversy surrounding the alleged infringement upon the registered Trademark "Tikiman," United States Registration Nos. 2,178,697; 2,260,278 and 2,204,469. The parties are numerous but the issues are straightforward. In his Third Amended Complaint ("TAC") Plaintiff accuses Defendants of trademark infringement under the Lanham Act and avers: (1) direct trademark infringement against some Defendants, TAC, p.14; (2) direct trademark infringement by counterfeiting against some Defendants, TAC, p.18; (3) direct

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

470

1  trademark infringement against all Defendants except Tikiman Jewelry.com and Tikiman Studio,

2  TAC, p.20; (4) trademark infringement by sale and distribution of counterfeit materials, against all

3  Defendants, TAC, p.24; (5) trademark infringement by importing counterfeit materials against

4  some Defendants, TAC, p.25; (6) trademark infringement by sale of Jewelry.com; Omodtart.com

5  and Tikiman Studio, TAC, p.27; (7) reverse passing off, against all Defendants, TAC, p.30; and

6  (8) trademark infringement by unfair competition, TAC, p.36.  Plaintiff requests injunctive relief,

7  statutory damages, treble damages as permitted by statute, as well as fees and costs. TAC, p.35.

8       Plaintiff failed to specifically address the eleven "uncontroverted" facts raised by the

9  Defendants as required under Local Rule 56-2-3.[1]  Nevertheless, the Court took pains to scour

10  the record and determine whether the facts are truly uncontroverted because the Plaintiff is

11  *pro se*.[2]

12       Plaintiff began using the Tikiman mark in 1989 to promote his sound recordings through

13  his company Duntel' la Entertainment.  Munford Decl., 113:7-10.  Plaintiff's Tikiman mark is an

14  acronym for, "Tendency In which Knowledge Increased Manifests Ascendent Nature."  Munford

15  Depo., 114:10-19.  The Tikiman mark was registered on July 13, 1999 and re-registered on April

16  8, 2002.  See United States Patent and Trademark Office, available at www.uspto.gov.  Plaintiff

17  claims that over the past fifteen years he sold approximately 900 to 1000 compact disks ("CDs")

18  bearing the Tikiman mark.  Munford Depo., 76:17-21.  Each of these CDs sold for an amount

19  between three to five dollars,[3] thus totaling approximately $3,000 to $5,000 for the sale of these

20  recordings over the past fifteen years.  Id. at 158:5-7, 15-17.

21

22  _____

23  [1] "In determining a motion for summary judgment, the Court will assume that the material facts
    as claimed and adequately supported by the moving party are admitted to exits without
24  controversy except to the extent that such material facts are (a) included in the 'Statement of
    Genuine Issues' and (b) controverted by declaration or other written evidence filed in opposition
25  to the motion." U.S. DIST. CT. C. DIST. CIV. Rule 56-3.

26  [2] "Although "it is not [the task] of the district court, to scour the record in search of a genuine
    issue of triable fact," Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996), this court will make an
27  exception.

28  [3] Plaintiff said this price was the "street price."  Munford Depo., 158:8.

1    There is a factual discrepancy here.  Plaintiff also claimed the total income generated from

2    1989 to present, including sales of records/CDs and performances under the Tikiman mark, was

3    approximately $35,000 to $42,000 dollars.[4]  See Munford Depo., 96:24-25, 97:1-3.  These figures

4    have not been substantiated by evidence.  Plaintiff alleges that he lacks such evidence due to a

5    flood that occurred in 1998 or "it could be stuff scattered in my storage boxes."  See Munford

6    Depo., 64:11-15, 65:11-25, 244:8-11; see also Munford Decl., ¶ 2.  Further, since 1997, Plaintiff

7    claims he sold CDs out of his trunk but he cannot remember the exact amount of sales nor does

8    he recall selling any CDs after 2000.  Munford Depo., 275: 11-12, 276: 16-23.

9    Plaintiff also admits that there was no use of the Tikiman mark in 2003 and 2004[5] and only

10   (possible) sporadic use of the mark in 2002 and 2001.  Munford Depo., 90:16-25, 91:1-10.  For

11   instance, Plaintiff cannot remember distributing fliers since 1993, Munford Decl., 321:1-20, the

12   mid-1990's was the last time he bought ad space in a magazine for advertising, Id. at 12-16, and

13   his final press release was in 2000 or 2001.  Id. at 324:18-20.  He also states that he may have

14   performed at one house party in 2001.  Id. at 276:14-24.  However, Plaintiff's statements do not

15   have evidentiary support.

16   On February 23, 2004, Defendants filed a motion for summary judgment pursuant to Rule

17   56 of the Federal Rules of Civil Procedure, claiming that there are no triable issues of fact with

18   respect to each claim of relief for trademark infringement, counterfeiting, and reverse passing off.

19   Defs' Mot. S.J., 1:17-21.

## LEGAL STANDARD

21   Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for granting a

22   motion for summary judgment.  It states in part:

23

24   [4] From 1989-2003, Plaintiff stated he earned from his music between $25,000 and $30,000
25   and approximately $10,000 to $12,000 from musical performances at house parties.  Munford
     Depo., 95:23-24, 96:13-18.  Later, Plaintiff states that he earned between $5,000 to $10,000 for
26   performances.  Id. at 280:19-20.

27   [5] Plaintiff admits that he did not make any sales of his "Tikiman" CDs in 2003 and 2004.
     Munford Depo., 91:6-10.  On the other hand, Plaintiff states "at no time did [he] stop using [his]
28   trademarks, Tikiman and Duntel' la, in commerce."  Munford Decl., ¶ 5.

3

1     The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

2

3

4 Fed. R. Civ. P. 56(c) (2003).

5     This standard has been explained by the Supreme Court of the United States in <u>Anderson</u>

6 <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S.

7 574 (1986), and <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

8     In <u>Anderson</u>, the Court set out the requisites needed to show there is no genuine issue as

9 to a material fact.

10     As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

11

12

13 <u>Anderson</u>, 477 U.S. at 248. The Court also held that "it is the substantive law's identification of

14 which facts are critical and which facts are irrelevant that governs." <u>Id.</u>

15     Regarding the existence of a genuine issue of material fact, the Court held that, summary

16 judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict

17 for the nonmoving party." <u>Id.</u> However, the Court also noted that "there is no issue for trial unless

18 there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that

19 party." <u>Id.</u> at 249. The nonmoving party has the burden of producing operative facts, and the

20 "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient;

21 there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> at 252. If the

22 operative facts are not presented, summary judgment is appropriate.

23     Once the moving party has met its burden under Rule 56(c), the nonmoving party "must

24 do more than simply show that there is some metaphysical doubt as to the material facts."

25 <u>Matsushita</u>, 475 U.S. 586. However, any inferences from the underlying facts must be viewed in

26 light most favorable to the nonmoving party. <u>Id.</u> at 587.

27     In <u>Celotex</u>, the Court explained that the nonmoving party must designate specific facts

28 showing a genuine issue for trial. Summary judgment is appropriate if a party, after adequate time

1    for discovery, "fails to make a showing sufficient to establish the existence of an element essential

2    to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477

3    U.S. at 322.  The moving party is not required to prove the absence of a genuine issue of fact,

4    even with respect to an issue on which the nonmoving party bears the burden of proof. Id. at 325.

5    "Instead . . . the burden on the moving party may be discharged by 'showing'–that is, pointing out

6    to the district court–that there is an absence of evidence to support the nonmoving party's case.

7    Id.  The Celotex Court also stated that "[o]ne of the principal purposes of the summary judgment

8    rule is to isolate and dispose of factually unsupported claims or defenses", id. at 323-24, and that

9    the summary judgment procedure should not be regarded as a "disfavored procedural shortcut"

10   but should be viewed as an "integral part of the Federal Rules as a whole, which are designed

11   'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

12        "[I]t is not [the task] of the district court, to scour the record in search of a genuine issue of

13   triable fact. [The courts] rely on the nonmoving party to identify with reasonable particularity the

14   evidence that precludes summary judgment."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.

15   1996). See also Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001)

16   ("The district court need not examine the entire file for evidence establishing a genuine issue of

17   fact, where the evidence is not set forth in the opposing papers with adequate references so that

18   it could conveniently be found.").

19                              **DISCUSSION**

20                        **Trademark Infringement**

21                         **Abandonment of Mark**

22        *i)*    ***The Lanham Act***

23        Defendants assert that Plaintiff's mark is invalid due to abandonment. Therefore, argue

24   Defendants, Plaintiff's claims for infringement and misuse must fail. Defs.' Mot. S. J., 3:3-5.

25        Section 45 of the Lanham Act states that "[a] mark shall be deemed to be

26   'abandoned'. . . (1) [w]hen its use has been discontinued with *intent* not to resume such use.

27   Intent not to resume may be inferred from circumstances.  Nonuse for *3* consecutive years shall

28   be *prima facie* evidence of abandonment. 'Use' of a mark means the *bona fide* use of such mark

1  made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15

2  U.S.C.A. § 1127 (1999) (emphasis added); See also Cerveceria Centroamericana S.A. v.

3  Cerveceria India, Inc., 892 F.2d 1021 (Fed. Cir. 1989).

4        "The Lanham Act rests on the idea of marks otherwise born of use rather than the creation

5  of marks by registration." Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 101 (5th Cir.

6  1983). "The Act does not allow preservation of a mark solely to prevent its use by others." Id.

7  Further, a mark is deemed to be used in commerce when it is associated with the goods that are

8  sold or transported in commerce and/or the "person rendering the services is engaged in

9  commerce in connection with the services." Id. Commercial strength of a mark can be shown

10 through "length and manner of use of the mark, the amount and volume of advertising, and the

11 volume of sales." Playmakers, LLC v. ESPN, Inc., 297 F.Supp. 2d 1277, 1281 (Wa. 2003) (citing

12 E. & J. Gallo Winery v. Consorzio del Gallo Nero, 782 F.Supp. 472 (N.D.Cal 1991).

13       The court focuses on the use of the mark due to the fundamental principles underlying

14 trademark law and the Lanham Act. The driving policy behind the Lanham Act is to grant

15 protection to trademarks so that consumers have confidence in the source and quality of the

16 products they purchase. See, e.g., Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F.Supp. 670, 677-

17 79 (S.D.N.Y. 1963); see also Kenner Parker Toys Inc. v. Rose Art Industries, Inc., 963 F.2d 350,

18 353 (Fed. Cir. 1990); Publications Int'l., Ltd. v. Landoll, Inc., 164 F.3d 337, 339 (7th Cir. 1998);

19 Smith v. Channel, Inc., 402 F.2d 562, 563-64 (9th Cir. 1968).  In this way, "trademarks desirably

20 promote competition and maintenance of product quality." Park 'N Fly, Inc. v. Dollar Park and Fly,

21 Inc., 469 U.S. 189, 193 (1985). It is on these grounds that trademark is distinguishable from other

22 intellectual property rights like copyright and patent.  That is also the reason why courts focus on

23 confusion in the marketplace rather than registration or ownership when adjudicating the issue

24 of trademark infringement.  In other words, it is a fundamental principle in trademark law that the

25 mark have some meaning in the marketplace. See, e.g., Saxlehner v. Wagner, 216 U.S. 375,

26 380-81 (1910).

27

28

6

1  *ii)*   ***Abandonment***

2      Once a *prima facie* showing of abandonment has been established by clear and convincing

3  evidence, Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.Supp. 2d 247, 268 (S.D.N.Y.

4  2002); see also Lanham Act § 45, 15 U.S.C.A. § 1127 (1999), the registrant must demonstrate

5  that it ***intended*** to use or ***resume*** use of the mark.  See Exxon Corp. v. Humble Exploration Co.,

6  Inc., 695 F.2d 96, 99, 102-03 (5th Cir. 1982) (emphasis added).  "The burden of proof is on the

7  party claiming abandonment, but when a *prima facie* case of trademark abandonment exists

8  because of nonuse of the mark for over two consecutive years, the owner of the mark has the

9  burden to demonstrate that circumstances do not justify the inference of intent not to resume

10  use."[6]  Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 99 (5th Cir. 1983); see also Star-kist

11  Foods, Inc. v. P.J. Rhodes & Co., 769 F.2d 1393, 1396 (9th Cir. 1985).  "'Bare assertion of

12  possible future use of trademark is not enough' to prove intent to resume use."  Emmpresa

13  Cubana Del Tabaco v. Culbro Corp., 213 F.Supp. 2d 247, 269 (S.D.N.Y. 2002) (quoting Silverman

14  v. CBS Inc., 870 F.2d , 40, 47 (2d Cir. 1989).  In order to rebut a presumption of abandonment,

15  the owner must "proffer more than conclusory testimony or affidavits."  Id. (quoting Imperial

16  Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed.

17  Cir. 1990).  Further, the owner of a mark cannot hoard a mark solely in order to prevent others

18  from using it.  See Ambrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1550 (11th Cir. 1986).  "The Lanham

19  Act does not permit such warehousing of trademarks."  Id.

20      "A registrant's proclamations of his intent to resume or commence use in United States

21  commerce during the period of nonuse are awarded little, if any, weight."  See Imperial Tobacco

22  Ltd.  v. Philip Morris, Inc., 899 F.2d 1575, 1582 (Fed. Cir. 1990); see also Golenpaul v. Rosett,

23  174 Misc. 114, 118 (N.Y.S.2d 1940) (stating that subjective intent is not enough to cure

24  abandonment if the mark has not been in use for such a length of time that it no longer signifies

25  the business in the mind of the public).

26

27  _____

28      [6]  This statute was amended, extending the period from two to three years.  15 U.S.C.A. § 1127 (1999).

1    Defendants argue that Plaintiff's length and manner of use of the mark, the minimal amount

2  of advertising, and the volume of uncorroborated sales do not constitute "use" as defined under

3  the Lanham Act. Defs.' Mot. S. J., 8:5. Further, they allege that even if the court were to consider

4  the uncorroborated sales, these sales are insufficient to meet the element of "use" because

5  Plaintiff's sales grossed "approximately $30,000 - $42,000 over a 10-12-year period." Id. at 8:8-11

6  and 24-25.

7    In turn, citing to Chance v. Pac-Tel Teletrac Inc., Plaintiff argues that the test applied

8  should be the "totality of the circumstances test" in order to establish use rather than determining

9  use through the amount of sales. Opp'n Mem. P. & A., 6:11. In Chance, the court found that

10  evidence of sales was highly persuasive, but based on a case-by-case basis, evidence of

11  adoption and use in a way "sufficiently public to identify or distinguish the marked goods in an

12  appropriate segment of the public mind as those of the adopter of the mark is competent to

13  establish ownership." Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1158 (9th Cir. 2001).

14  (citing New West Corp. v. NYM Co. of California, Inc., 595 F.2d 1194, 1200 (9th Cir. 1979)). As

15  a result, Chance does not really support Plaintiff's argument.

16    Chance is distinguishable from the instant case on the grounds that the court in Chance

17  addressed the issue of first use of the mark in commerce, not abandonment. See id. at 1154.

18  Further, the court emphasizes that to constitute use, the mark must be used in a way that the

19  public can identify the marked goods with the adopter of the mark. Id. at 1158. Therefore,

20  Plaintiff must prove the public associates his mark with his product only. See id. Thus, if Plaintiff

21  lacks proof of sales, Plaintiff must present other evidence such as public identification with the

22  Plaintiff's mark, see Silverman, 870 F.2d at 48, or strength of its commercial use through

23  substantial advertising. See Playmakers, LLC v. ESPN, Inc., 297 F.Supp. 2d 1277, 1281 (Wa.

24  2003). Plaintiff has failed to supply such proof. Instead, Plaintiff only supplies arguments and

25  conclusory statements without evidentiary support. See generally Munford Decl.

26    Plaintiff states that he has no intent to abandon his mark and therefore he claims it is not

27  abandoned. Opp'n Mem. P. & A., 7:13-16. However, Plaintiff fails to substantiate this statement

28  with reference to any evidence aside from a self-serving declaration. See Id. Further, Plaintiff

1 | does not deny his lack of use, but rather attempts to excuse his lack of use by insisting that this

2 | litigation and his financial situation are the cause. See Id. As Defendants correctly point out,

3 | "[t]he motive for cessation of use is irrelevant." Stetson v. Howard D. Wolf & Associates, 955 F.2d

4 | 847, 851 (2d Cir. 1992).

5 |      Second, Plaintiff's amount of advertising has not been substantial or consistent, thus failing

6 | to create public identification with the Tikiman mark. Munford Depo., 322:6-25, 323:2-9; see also

7 | Munford Interrog., ¶¶ 4-5. Plaintiff admits that the vast majority of his advertising was through

8 | distribution of fliers between the years of 1989 and 1997. Id. Since that time, Plaintiff estimates

9 | that he distributed approximately 200 to 300 fliers. Id. In addition, the only other source of

10 | advertising was through word of mouth. Id. "For advertising alone to constitute use of mark

11 | sufficient to confer trademark ownership, it must be of sufficient clarity and repetition to create

12 | required identification and must have reached substantial portion of public that might be expected

13 | to purchase service." Lucent Information management, Inc. v. Lucent Technologies, Inc., 986

14 | F.Supp. 253, 259 (D.Del. 1997) (quoting T.A.B. Systems v. Pactel Teletrac, 77 F.3d 1372, 1377

15 | (Fed. Cir. 1996)).

16 |      Due to the sporadic nature of his promotional attempts, lack of volume, and inconsistency

17 | of Plaintiff's advertising, Plaintiff cannot demonstrate sufficient use of the mark. Plaintiff has also

18 | failed to show any public identification of the mark and thus fails to meet the "totality of

19 | circumstances" test as defined by the court in Chance. See Chance, 242 F.3d at 1158.

20 | Moreover, it is unclear whether the court should even apply the "totality of the circumstances test"

21 | in the instant case because this is not a question of "first use."

22 |      Moreover, Plaintiff's sporadic sales fail to demonstrate any use of the mark in the way the

23 | term "use" is defined by case law or statute. See Exxon, 695 F.2d at 97. As a response to an

24 | interrogatory, Plaintiff admitted that the total amount of income earned from the sale of any

25 | musical work utilizing the Tikiman mark from 1989 to the present was "approximately $25,000.00."

26 | Munford Interrog., ¶ 21. Assuming that is true, over a fourteen year period Plaintiff sold

27 |

28 |

1   approximately $1,720.00 per year.[7]  Plaintiff also claims earnings of approximately $10,000 -

2   $12,000 dollars over the past fourteen to fifteen years from musical performances.  Munford

3   Depo., 96: 16-23.  Incorporating the total sales with the earnings from performances, Plaintiff

4   earned an average of $3,000 to $3,500 per year.  Id. at 97:13-15.  In addition, the last time

5   Plaintiff performed as Tikiman was in 2000, with three or four performances at house parties.

6   Munford Depo., 275:3-5, 278:2-3.  Again, Plaintiff has been unable to substantiate any of these

7   figures or performances with documents.  See Munford Decl., ¶ 1; see also Munford Depo.,

8   242:24.  As a result, those statements remain little more than unsubstantiated assertions.  In any

9   event, even if true, they do little to help Plaintiff's case.

10         However, Plaintiff claims that a presumption of abandonment can be rebutted by a showing

11   of valid reasons for nonuse.  Opp'n., 6:12-18; see also Star-Kist Foods, Inc. v. P.J. Rhodes &

12   Company, 769 F.2d 1393, 1396 (9th Cir. 1985) (trademark not abandoned where predecessors

13   ceased using mark due to unprofitability but intended to resume use when profit could be made).

14   "[T]he registrant must put forth the evidence with respect to what activities it engaged in during

15   the nonuse period or what outside events occurred from which an intent to resume use during the

16   nonuse period may reasonably be inferred."  Imperial Tobacco Ltd., Assignee of Imperial Group

17   PLC v. Philip Morris, Inc., 899 F.2d 1575, 1581 (Fed. Cir. 1990) (finding that plaintiff's proffered

18   business reasons excusing nonuse were insufficient); see also Exxon, 695 F.2d at 99-101 (where

19   limited sales through three shell corporations during a three year period were not sufficient uses

20   to avoid prima facie proof of abandonment).

21         Plaintiff maintains that his reasons for nonuse of the mark are lack of money and time due

22   to the present litigation and lack of outside support in furthering his career.  Opp'n., 7:6-12.

23   However, Plaintiff fails to supply evidentiary support for these reasons of nonuse.  Admittedly,

24   there was nonuse of the Tikiman mark in 2003 and 2004 and only (possible) limited sporadic use

25

26

27

28     [7]  During a deposition, plaintiff stated he sold approximately 50 units of Tikiman recordings
in 2003.  Munford Depo. 242:15-21.  This also has not been substantiated.

1   of the mark in 2002, 2001 and 2000.[8]  This sporadic "use" does not amount to use as defined by

2   leading case law.  See Exxon, 695 F.2d at 99-101; see also La Societe Anonyme des Parfums

3   LeGalion v. Jean Patou, Inc., 495 F.2d 1265 (2d Cir.1974) (court held that 89 sales over a 20 year

4   period is nonuse); Procter and Gamble v. Johnson & Johnson, Inc., 485 F.Supp. 1185

5   (S.D.N.Y.1979), aff'd without opinion, 636 F.2d 1203 (2d Cir.1980).  As a result, the Tikiman mark

6   has not been in use for over three consecutive years.  This constitutes *prima facie* abandonment.

7   See 15 U.S.C.A. § 1127 (1999).  Without evidentiary support to show otherwise, Plaintiff's

8   attempted justification for his nonuse over three years is not sufficient to survive a motion on

9   summary judgment.

10         Rule 56 of the Federal Rules of Civil Procedure specifies that a party may not rest upon

11   mere allegations.  Fed. R. Civ. P. 56.  Rather, a party must provide:

12          [s]worn or certified copies of all papers or parts thereof referred to in
            an affidavit shall be attached thereto or served therewith. . . .When a
13          motion for summary judgment is made and supported as provided in
            this rule, an adverse party may not rest upon the mere allegations or
14          denials of the adverse party's pleadings. . .

15   Id. at 56(e).  Further, self-serving statements are not enough to rebut a presumption of

16   abandonment.  In Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054 (9th Cir. 2002), the court

17   refused to find a genuine issue of fact "where the only evidence presented is 'uncorroborated and

18   self-serving' testimony." Id. at 1061.

19         Even assuming *arguendo* that Plaintiff was able to substantiate these sales, the sales are

20   not significant enough to constitute commercial use, as Plaintiff's sales are *de minimis*.  See

21   Sweetarts v. Sunline, Inc., 436 F.2d 705, 709 (8th Cir. 1971) (where the sales totaling $20,008.00

22   over a 16-year period were insufficient to support a claim of use); see also Accu Personnel v.

23   Accustaff, Inc., 846 F.Supp. 1991, 1206 (D.Del 1994) ("When sales activity does not exceed even

24

25

26         [8] Plaintiff admits that he cannot remember distributing fliers since 1993, Munford Decl., 321:1-
27   20, and the last time he did a press release was in "2000, 2001." Id. at 324:18-20.  He also
     states that he may have performed at one house party in 2001. Id. at 276:14-24.  None of this
28   is substantiated with evidence, however.

1  a minimum threshold level, a court may properly conclude that market penetration. . . simply has

2  not been demonstrated.")

3       Defendants have proved by clear and convincing evidence that Plaintiff has abandoned

4  the "Tikiman" mark for at least three consecutive years as required under the statute. See 15

5  U.S.C.A. § 1127 (1999). Further, Plaintiff has failed to make any showing of use in order to rebut

6  Defendants' *prima facie* showing of abandonment and thus has not provided a triable issue of

7  material fact. See Star-Kist, 769 F.2d at 1396.

8       Accordingly, summary judgment is hereby GRANTED.

9                                **Likelihood of Confusion**

10      Assuming *arguendo* that Plaintiff has not abandoned his mark, in order to prevail in an

11 infringement cause of action, Plaintiff must prove that the goods are related and the marks are

12 sufficiently similar that consumer confusion will likely result. AMF Inc. v. Sleekcraft Boats, 599

13 F.2d 341, 348 (9th Cir. 1979).

14      In determining whether confusion between goods is likely, the following factors, although

15 not dispositive, are relevant:  (1) strength of plaintiff's mark; (2) similarity of plaintiff's and

16 defendant's marks in appearance, sound and meaning; (3) the class of goods (4) marketing

17 channels involved; (5) evidence of actual confusion; and (6) defendant's intent in selecting the

18 mark. Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc., 944

19 F.2d 1446, 1455 (9th Cir. 1991); AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348 (9th Cir. 1979);

20 J.B. Williams Co., Inc. v. Leconte Cosmetics, Inc., 523 F.2d 187, 191 (9th Cir. 1975).

21      This is a highly pliant[9] test with some factors receiving more weight than others. See

22 Brookfield Communciations, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1054 (9th

23 Cir. 1993).  The court is to determine whether and how specific factors are used on a case-by-

24

─────────────

25   [9] "A word of caution: this eight-factor test for likelihood of confusion is pliant.  Some factors
   are much more important than others, and the relative importance of each individual factor will be
26 case-specific. Although some factors - such as the similarity of the marks and whether the two
   companies are direct competitors -will always be important, it is often possible to reach a
27 conclusion with respect to likelihood of confusion after considering only a subset of the factors."
   Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1054 (9th
28 Cir. 1993).

1   case basis. See id.  In some cases, the Ninth Circuit relies heavily on the fact that the marks are

2   similar, the proximity of the goods and the marketing channels used.  GoTo.com, Inc. v. Walt

3   Disney Company, 202 F.3d 1199, 1205 (9th Cir. 2002).  The court should consider the eight

4   factors roughly in order of importance.  Brookfield, 174 F.3d at 1054 n.16.  Accordingly, the court

5   begins its analysis by examining the strength of the mark.

6                                    **Strength of Mark**

7          The first factor, the strength of the plaintiff's mark, is determined by the distinctiveness of

8   the mark and the degree to which prospective customers associate the mark with a particular

9   product. Estee Lauder Inc. v. Gap, Inc., 108 F.3d 1503, 1510 (2d Cir. 1997).  Although the mark

10  "Tikiman" is distinctive and not a generic term, the Plaintiff has not established that customers

11  associate Plaintiff's "Tikiman" with his products.  During a video-taped deposition, Plaintiff

12  concluded that he sold nine hundred to one thousand CDs, records, and tapes from 1989 to

13  present. Munford Depo, 154:9-14.  These CDs, records and tapes were mostly sold by foot or

14  from the trunk of his car. Id. at 155:2-5.  Due to the fact that Plaintiff has failed to establish

15  sufficient proof that the public associates the "Tikiman" mark with his products combined with the

16  fact that Plaintiff only sold nine hundred to one thousand items from the trunk of his car over a

17  fourteen year period, this court concludes that Plaintiff's mark is not strong in the market place.

18  See Sweetarts v. Sunline, Inc., 436 F.2d 705, 709 (8th Cir. 1971); see also Accu Personnel v.

19  Accustaff, Inc., 846 F.Supp. 1991, 1206 (D.Del 1994) ("When sales activity does not exceed even

20  a minimum threshold level, a court may properly conclude that market penetration . . . simply has

21  not been demonstrated.")

22                                  **Similarity of Mark**

23         The second factor asks whether the Plaintiff's mark is similar to the Paul St. Hilaire's mark

24  in appearance, sound and meaning. See Sleekcraft, 599 F.2d at 350.  Plaintiff contends that the

25  "counterfeit" mark of "Tikiman" used by Defendants is identical to Plaintiff's mark. Opp'n Mem P.

26  & A., 8:6-11.  Plaintiff claims that both marks are placed on identical products [CDs]. Id.  Standing

27  alone, the word "Tikiman" is the same and when pronounced, it sounds the same. See Sleekcraft,

28  599 F.2d at 350.  Therefore, this factor weighs in favor of Plaintiff.

**Class of Goods and Marketing Channels**

The next two factors to consider are the class of the goods and the marketing channels used by the alleged infringer(s). See Sleekcraft, 599 F.2d at 353. Plaintiff asserts that the goods are similar, marketed to the same consumers and distributed by the same channels in commerce. Opp'n Mem P. & A., 8:6-11. In the instant case, the products are sound recordings fixed in CDs but with different artists and different music. The Sleekcraft Court used the standard of "typical buyer exercising ordinary caution" when considering whether the class of goods are similar. Sleekcraft, 599 F.2d 341, 353 (9th Cir. 1979). Common sense dictates that a typical purchaser of CDs does not make a purchase solely based on general impressions of the name on the cover. See id. at 353 (The court found that trademarks are unimportant to the average boat buyer. "Common sense and the evidence indicate this is not the type of purchase made only on 'general impressions.'") (citing Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 161 (9th Cir.)). A reasonable purchaser is familiar with the artist's work and looks at the contents contained in the CD and the title. Plaintiff even admits that he does not know of anyone who mistakenly purchased St. Paul Hilaire's CD instead of his CD. See Munford Depo., 226:9-16, 228:4-6. Plaintiff fails to establish any similarity between the products. For all the court knows, the infringing products are chamber music whereas Plaintiff purports to be a hip hop artist. See Opp'n., Exh. 13.

In addressing the channels of commerce factor, the court in Sleekcraft considered localities, sales methods employed, price ranges of the products, and advertising. Sleekcraft, 599 F.2d at 353. First, the locality of the sales by the Plaintiff were in "California, San Diego, El Cajon, Oceanside, New Mexico, Arizona, El Paso, Albuquerque. . . [and] Las Vegas." Munford Depo., 269:11-22. In contrast, Defendants' localities are international and include internet websites where a consumer can purchase the St. Paul Hilaire CD from virtually anywhere. Second, the sales method employed by the Plaintiff and Defendants are different. Plaintiff's products are not sold in stores, but rather out of a trunk of a car, see Munford Depo. 155:3-5, while Defendants are sellers of goods in the domestic and international market, marketing physical stores and online

1  websites.[10] Third, the price ranges of the products are not identical.  Plaintiff stated that he sold

2  his CDs at a price of $3 to $5 dollars.  Id. at 158:5-7, 15-17.  On the other hand, a quick review

3  of the Defendants' websites reveals St. Paul Hilaire's CD is approximately $13 dollars.  There is

4  a vast difference between the prices.  Finally, Plaintiff advertised mainly through distribution of

5  fliers and word of mouth, during the 1990s and has not advertised since this time.  See Munford

6  Depo., 322:6-25, 323:2-9.  Defendants on the other hand, employ the sophisticated marketing

7  techniques and packaging typical of large corporations.

8      The central issue is whether the public will mistakenly assume there is an association

9  between the producers of the related goods.  Academy of Motion Picture Arts and Sciences, 944

10  F.2d at 1455.  It seems unlikely the public would associate Plaintiff's product physically sold from

11  the trunk of a car, with Paul St. Hilaire's product sold on major websites and in retail stores.

12  Accordingly, even though the goods in question are sound recordings fixed in CDs, there is no

13  evidence that these are similar in type and the marketing channels are vastly different.  Therefore,

14  the public is unlikely to confuse the products.  As a result, this factor weighs in favor of the

15  Defendants.

16  **Actual Confusion**

17      This fifth factor, evidence of actual confusion, is not given much weight in the Ninth Circuit.

18  See GoTo.com, Inc. v. Walt Disney Company, 202 F.3d 1199, 1205 (9th Cir. 2002).  Therefore,

19  the court will not discuss this factor in depth.  In general, when making a determination of

20  likelihood of confusion, evidence of actual consumer reaction or surveys are helpful.  See, e.g.,

21  Clicks Billards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 1262 (9th Cir. 2001).  In the instant case,

22  Plaintiff has not produced any consumer surveys or other proof of consumer reaction.  Instead,

23  Plaintiff admits that there is a lack of confusion stating that no one has purchased one of Paul St.

24  Hilaire's CDs thinking it was the Plaintiff's CD.  See Munford Depo., 225:20-25.  Therefore, this

25  factor weighs in favor of the Defendants.

26

27  _____

28     [10]  Looking at the Order and list of Defendants, each Defendant is either a well-known corporation or a dot.com business.

1                                                **Intent**

2         The sixth factor, intent, is of minimal importance in the Ninth Circuit.  See GoTo.com, Inc.,

3 202 F.3d at 1205.  "Importantly, an intent to confuse customers is not required for a finding of

4 trademark infringement." Id. at 1208 (quoting Brookfield, 174 F.3d at 1059).  As a result, the court

5 will not analyze this factor.

6         Based on the preceding analysis, this court finds that Plaintiff has failed to prove that the

7 goods are related and the marks are sufficiently similar that consumer confusion within the

8 marketplace would result.

9                                       **CONCLUSION**

10         The principal purpose of the summary judgment rule is to isolate and dispose of factually

11 unsupported claims or defenses.  Celotex, 477 U.S. at 323-24.  Here, Plaintiff has failed to

12 provide anything more than "metaphysical doubt" by offering conclusory statements

13 unsubstantiated by fact.  Accordingly, for the reasons stated above, the motion for summary

14 judgment is GRANTED in favor of Defendants.  Plaintiff's right to the trademark "Tikiman" is

15 deemed abandoned.  The trademarks bearing United States Registration Nos. 2,178,697;

16 2,260,278 and 2,204,469 are hereby CANCELLED.  See 15 U.S.C. § 1119 (1976).

17

18 Dated this ___ day of April, 2004.

19                                             S. James Otero

20                            _____

21                                    S. JAMES OTERO
                             UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28